UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CEBRAM L. ROSTON,

Petitioner,

v.

DAVID B. LONG, Warden,

Respondent.

Case No.  15-cv-00729-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

Petitioner Cebram L. Roston, a state prisoner currently incarcerated at the California City Correctional Facility, brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2012 conviction and sentence rendered in the Lake County Superior Court.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the petition for the reasons set forth below.

## I.   FACTUAL BACKGROUND

The California Court of Appeal described the relevant facts as follows:

> Jerry Maggio testified that on April 8, 2012, between 11:00 and 11:30 p.m., he was standing outside the side of the Safeway in Clearlake eating some cereal.  He noticed a car pull up to the front of the store and saw two people get out.  Appellant, with whom Maggio had gone to high school, got out and walked toward the front of the store while the driver stood by the back of the vehicle.
>
> About six minutes later, appellant walked up to Maggio and, without saying anything, punched him in the face.  Maggio fell. Appellant grabbed his jacket with both hands, shook him, and said loudly, "Give me your money."  Maggio said his spine was injured and asked appellant not to hurt him.  Appellant shook Maggio several more times, each time demanding money and each time Maggio saying he did not have any.  Appellant reached into Maggio's right pants pocket with his right hand and felt around, and shook Maggio several more times, lifting him more than a foot and a half off the ground and hitting his lower spine on the concrete.   After the seventh shaking, appellant pulled out of Maggio's right pocket a plastic Safeway shopping bag containing an insurance card, a bank card, some appointment cards, some receipts, a flashlight and a lighter.   Appellant threw the bag to his right and Maggio's bank card, driver[']s license, two appointment cards and two receipts fell out.   Appellant then reached into Maggio's left pants pocket and ripped it upward, ripping the pants from the pocket to the leg area and across to the waist.  Appellant shook Maggio again, Maggio

again said he had no money, and appellant ripped open Maggio's jacket, which had been zipped and buttoned, and felt around the inside of the jacket. Appellant released Maggio, who fell to the ground, stepped to his right, picked up the plastic bag with Maggio's belongings, and left in the car, which had pulled around from the parking lot. Maggio never got back his lighter, his flashlight, some of his appointment cards, his insurance card or his bank card. Although he initially testified only that appellant picked up the bag and took it with him when he left, he later testified that appellant also picked up the bank card that had fallen on the ground and took that as well.

Maggio got up and picked up a receipt he had seen fall out of appellant's pocket, as well as two appointment cards that appellant had dropped. A woman who worked in the store approached and asked Maggio if he was okay and if he wanted to contact the police. He went into the store with her and she called the police, who arrived a few moments later. Maggio explained to Officer Cook what had happened. The officer left, then returned later and showed Maggio some photographs. Maggio identified appellant and gave Cook the receipt that appellant had dropped.

Maggio had not been drinking alcohol or taking any medication before the assault.

On cross examination, defense counsel elicited Maggio's testimony that he had talked to Officer Cook and to the prosecutor the day before but did not discuss the questions he would be asked when he testified. Maggio had trouble remembering the specific conversations, saying he had spoken with the prosecutor more than once and with Cook more than five but not more than seven times, not six times, and finally estimating nine times. Maggio said Cook had talked to him the day before about 13 photographs that defense counsel showed him. He acknowledged having testified in an earlier proceeding that appellant lifted him off the ground at most six to eight inches, whereas at trial he said it was at least one and a half feet. Maggio testified that he had not taken any medication within the past 24 hours that might affect his ability to remember and communicate the events of April 8, 2012, including Vicodin or other pain killers. When defense counsel asked whether Maggio had been the victim of another assault, the court sustained the prosecutor's relevance and Evidence Code section 352 objections.

Sandra Kirby, a Safeway employee, was in the parking lot around 11:00 p.m. on April 8, 2012, returning her shopping cart after putting groceries in her car. She heard a person saying "I don't have any money, dude" and looked over to see Maggio, whom she knew as a regular Safeway customer, being assaulted about 150 feet away. The assailant was bent over, holding Maggio's jacket with both hands and "picking him up and slamming him on the ground." Kirby could not see who the assailant was or whether he was reaching into Maggio's pocket. Kirby yelled "hey, stop" and turned around to get her cell phone from her car and call the police. She then saw the assailant run to the end of the parking lot, get in the passenger side of a car and leave.

Kirby called to Maggio, who was standing and picking up a few cards that had been in his pocket, asking if he was alright. When she got over to him, Maggio was holding the side of his face; he asked if it was swollen because he had been punched. Maggio's pants were torn along the seam by the pocket. Kirby and Maggio went into the store and Kirby called the police.

David Lewis, who was working as a checker at the Safeway on the night of April 8, 2012, testified that a large black male wearing a blue shirt with white lettering or design on the front bought some candy on his line that night. Lewis identified the receipt Maggio had given to Cook, which showed the time 11:22 p.m., as being the time when the man bought the items. The man did not appear to have been drinking. Lewis testified that it was possible appellant was the man he saw, but he saw too many faces each day to be sure.

Joseph Flores testified that he drove to Safeway with appellant on April 8. He parked in front of the store and appellant got out of the car. About eight or nine minutes later, Flores saw appellant hit a man at the corner of the store. The man fell to the ground.[FN 1] Flores pulled the car over and told appellant to stop; appellant got in, and they left. Flores asked appellant why he had beaten the man and appellant said he was "stressed out about needing money" and was "angry and took it out on the first person he seen." Asked if he had told the police that appellant said "I'm mad and I need someone's money," Flores stated, "if that's what's in the report that's—I guess that's probably what I said, but, you know, he's just stressed because he needed money, you know really."

[FN 1:] When interviewed by the police that night, Flores said that appellant had knocked the man down and "started slamming him into the ground[]" but he testified that this was a bad choice of words; the man was holding onto appellant and appellant was "shaking him off."

Flores had been convicted of two felonies, burglary in 1996 and receiving stolen property in 2007, and four misdemeanors, accessory after the fact in 2000, vandalism in 2003, automobile theft in 2005, and receiving stolen property in 2012. He was on probation at the time he testified. He had known appellant since he was a kid and did not want to see anything bad happen to him.

Police Officer Elvis Cook was dispatched to the Safeway about 11:33 p.m. on April 8, where he interviewed Maggio, Kirby, and Lewis. Maggio, who appeared upset and distressed, had a cut on his lip and slight redness on his cheek and lip area, and his pants pocket was ripped open. He told Cook what had happened and identified his assailant as "Larry," which the parties had stipulated was the name by which appellant was known in the community. From Maggio's description, Cook believed he knew who the suspect was, so he returned to the police station and compiled a photographic lineup to show Maggio. He returned to the scene, and Maggio identified appellant's photograph. During this second interview, Maggio gave Cook a Safeway receipt he said appellant had left at the scene.

Cook went to Flores's house, spoke with him and photographed his car, which was parked in front. He then went to appellant's house, next door to Flores's, arriving there about 1:05 or 1:10 a.m. on April 9. Appellant was asleep when Cook arrived. Once woken, appellant showed signs of having consumed alcohol but did not appear highly intoxicated; his demeanor, balance and speech were "normal." Appellant was wearing clothes that matched the description Maggio and Lewis had given to Cook. The police did not search appellant's home, but saw a plastic Safeway bag in plain sight. None of the items Maggio reported being stolen were recovered.

Cook's contact with appellant was captured on an audio recording, which was consistent with Cook's description. Asked to tell Cook what happened at Safeway, appellant said, "I'm a little upset that my money wasn't on my card and that was it. [¶] . . . [¶] I spent more, spent my, more money than I thought and . . . ." Cook queried, "So you were a little upset 'cause you didn't have any money?'" Appellant replied, "Yes sir." Appellant said he had drunk "[a]lmost a thirty pack" that night, commenting that it was his birthday. Appellant said he had walked to Safeway by himself. He initially said he did not buy anything, then when told that the store camera showed him buying something and Cook had the receipt, appellant said he bought Snickers bars.[FN 2] Appellant acknowledged pushing and hitting Maggio, grabbing him by the jacket and yelling at him, but did not remember what he yelled and denied taking anything from him.

[FN 2:] Cook's statement about the camera was not true; it was a "ruse" to make appellant "more forthcoming."

*People v. Roston*, No. A136743, 2014 WL 4088196, *1-3 (Cal. Ct. App. Aug. 20, 2014) (footnotes in original), Dkt. 9-15.

## II.  PROCEDURAL BACKGROUND

On July 20, 2012, a Lake County jury convicted Petitioner of robbery pursuant to California Penal Code § 211, and Petitioner subsequently admitted that he served a prior prison term within the meaning of California Penal Code § 667.5(b). CT 6-7. On September 26, 2012, the trial court sentenced Petitioner to six years in state prison. CT 314.

On March 14, 2013, Petitioner appealed the judgment to the California Court of Appeal. Dkt. 9, Ex. 3. On August 20, 2014, the California Court of Appeal affirmed Petitioner's conviction. *Roston*, 2014 WL 4088196, *11.

On September 26, 2014, Petitioner filed a petition for review in the California Supreme Court. Dkt. 9, Ex. 10. On November 19, 2014, the California Supreme Court denied the petition. Dkt. 9, Ex. 11.

4

1    On February 17, 2015, Petitioner filed the instant petition, alleging: (1) his trial counsel

2    provided ineffective assistance by failing to move to suppress Petitioner's statement to police on

3    the basis that it was obtained as a result of an unlawful warrantless entry into his home; and (2) the

4    trial court erred by excluding evidence of Mr. Maggio's prior accusations of being victimized,

5    thereby violating Petitioner's constitutional rights to cross-examine witnesses against him and

6    present a defense.  Dkt. 1 at 5.

7    On May 1, 2015, this Court issued an Order to Show Cause.  Dkt. 4.  Respondent filed an

8    Answer.  Dkt. 9.  Although given the opportunity to do so, Petitioner did not file a Traverse.  The

9    matter is fully briefed and ripe for adjudication.

10   **III.    LEGAL STANDARD**

11   A federal court may entertain a habeas petition from a state prisoner "only on the ground

12   that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

13   U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996,

14   a district court may not grant a petition challenging a state conviction or sentence on the basis of a

15   claim that was reviewed on the merits in state court unless the state court's adjudication of the

16   claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

17   clearly established Federal law, as determined by the Supreme Court of the United States; or

18   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

19   the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong

20   applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v.*

21   *Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual

22   determinations, s*ee Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

23   A state court decision is "contrary to" Supreme Court authority, that is, falls under the first

24   clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

25   reached by [the Supreme] Court on a question of law or if the state court decides a case differently

26   than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams (Terry)*, 529

27   U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court

28   authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the

United States District Court
Northern District of California

5

governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).  Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).  When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent.  *See Ylst*, 501 U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  The last reasoned decision in this case is the Court of Appeal's unpublished disposition issued on August 20, 2014.

United States District Court
Northern District of California

**IV.    DISCUSSION**

**A.    Ineffective Assistance of Counsel**

Petitioner contends that his trial counsel rendered ineffective assistance by failing to move to suppress his statement to the police on the basis that it was obtained as a result of an unlawful warrantless entry into his home.  Dkt. 1 at 5.

**1.  Background**

As mentioned above, Officer Cook went to Petitioner's home at about 1:05 or 1:10 a.m. on April 9, 2012.  *Roston*, 2014 WL 4088196, *3.  Officer Cook recorded his interview of Petitioner, and the defense prepared a transcript of that recording for trial.  CT 127-134.  The transcript reflected that the officers first made contact with Petitioner's girlfriend, Ms. Canevari, at Petitioner's home after knocking on the door, and that the following encounter occurred as follows:

(Knocking)

CANEVARI:  Who is it?

COOK:         Police Department.

CANEVARI:  Yes?

COOK:         Hello.

CANEVARI:  Hi.

COOK:         Is Larry here?

CANEVARI:  He's sleeping.

COOK:         Can we talk to him?  Where's he at?

CANEVARI:  Larry.  Larry.

UNKNOWN:  Ma'am.

COOK:         Ma'am, do me a favour, step on out here.

UNKNOWN:  Come on out.

CANEVARI:  Larry.

COOK:         Ma'am.  Do me a favour.

UNKNOWN:  Ma'am, ma'am.  Come out here.

CANEVARI:  Sorry.  Uh.

| | | |
|---|---|---|
| 1 | COOK: | Larry, do me a favour, stand on up. |
| 2 | UNKNOWN: | (Unintelligible) |
| 3 | UNKNOWN: | Hey Larry. |
| 4 | COOK: | Walk on out this way Larry.  Don't grab anything, |
| 5 | | don't reach in your pockets. |
| 6 | CANEVARI: | What the hell babe.  What happened? |
| 7 | ROSTON: | (Unintelligible) ---- (makes noise) |
| 8 | COOK: | Do me a favour Larry, turn around, put your hands on the wall.  Larry, put your hands behind your back. |
| 9 | CANEVARI: | What happened?  Please tell me. |
| 10 | UNKNOWN: | We'll tell you, hang on ma'am. |

CT 127-28.

After Officer Cook read Petitioner his *Miranda*[1] rights, he asked Petitioner "what happened over at Safeway." CT 129.  Petitioner admitted that the night before, he had gone into the Safeway to buy something, but he did not have any money.  CT 130.  Petitioner stated that he was "a little upset that [his] money wasn't on [his] card . . . ."  CT 130.  Petitioner claimed that he had been drinking because it was his birthday, and that he consumed "[a]lmost a thirty pack."  CT 130.  Petitioner then stated that when he walked outside the Safeway, he "hit a man."  CT 132. Petitioner said he knew the man because he went to school with him, and that his name was "Jerry."[2]  CT 132.  Petitioner added that he "pushed [Mr. Maggio]," and caused Mr. Maggio to fall over.  CT 132.  Petitioner admitted to grabbing Mr. Maggio by the jacket and yelling at him, but Petitioner could not remember what he was yelling about.  CT 133.  Petitioner claimed that he did not take anything from Mr. Maggio.  CT 133.  Petitioner was then told he was being placed under arrest for assault and robbery.  CT 134.  None of the items Mr. Maggio complained of as being stolen were recovered.  2RT 420.

The state appellate court recited the following background facts relating to defense

_____

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] As mentioned above, the victim's name is Jerry Maggio.

8

counsel's motion to suppress:

> On July 9, 2012, appellant filed a motion in the trial court seeking to suppress all evidence obtained from him on the grounds that the police lacked probable cause to detain appellant and unreasonably acted without a warrant.  On July 12, defense counsel told the court she had erred in not filing the motion earlier and asked the court to hear it despite it being untimely.  The court questioned whether it had jurisdiction to do so.  After discussing the matter with appellant and defense co-counsel, appellant's attorney stated that they had decided to withdraw the motion to suppress because the argument was "legally weak" in light of "the underlying legal authority for exigent circumstances in pursuit of a fleeing felon."  Counsel instead pursued an alternative argument that appellant did not validly waive his *Miranda* rights.

*Roston*, 2014 WL 4088196, *3 (footnote omitted).  Defense counsel also informed the trial court that Petitioner "concur[red]" in her decision to withdraw the aforementioned motion to suppress. 1RT 71.  The trial court subsequently acknowledged defense counsel's request to withdraw the motion to suppress, and the motion was withdrawn.  1RT 70-72.  The court then conducted a hearing on whether there was a compliance with *Miranda* to show that the aforementioned statements during Officer Cook's interview were given voluntarily by Petitioner by a preponderance of the evidence.  1RT 72-115.  After listening to the testimony of Officer Cook and the arguments of counsel, the trial court found that Petitioner's aforementioned statements were voluntary based on finding of a valid implied waiver, and thus determined that they were admissible.  1RT 116-121.

### 2.  State Court Opinion

The state appellate court applied the standard of review set forth in *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and rejected Petitioner's ineffective assistance of counsel claim.  *Roston*, 2014 WL 4088196, *3-8.   The state appellate court relied on the rule that when a defendant raises a claim of ineffective assistance of counsel based upon defense counsel's failure to bring a motion to suppress evidence on Fourth Amendment grounds, he is required to demonstrate that the Fourth Amendment claim had merit.  *Id.* at *4 (citing *People v. Frye*, 18 Cal. 4th 894, 989 (1998), *disapproved on other grounds in People v. Doolin*, 45 Cal. 4th 390, 421, n.22 (2009)).  The state appellate court emphasized that there are several exceptions to the warrant requirement, stating as follows:

9

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

"'It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."' (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748.) A warrantless entry is 'presumptively unreasonable.' (*Payton v. New York* (1980) 445 U.S. 573, 586.) This presumption can be overcome by a showing of one of the few 'specifically established and well-delineated exceptions' to the warrant requirement (*Katz v. United States* (1967) 389 U.S. 347, 357), such as "'hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling"' (*Minnesota v. Olson* (1990) 495 U.S. 91, 100). The United States Supreme Court has indicated that entry into a home based on exigent circumstances requires probable cause to believe that the entry is justified by one of these factors . . . . *Ibid*.)" (*People v. Celis* (2004) 33 Cal. 4th 667, 676.)

"[I]n appropriate circumstances the fresh pursuit of a fleeing felon may constitute a sufficiently grave emergency to justify an exception to the warrant requirement and make it constitutionally reasonable for the police to enter a private dwelling without prior authorization of a magistrate. (See, e.g., *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 481; *Warden v. Hayden* (1967) 387 U.S. 294, 298-299; *People v. Wetzel* (1974) 11 Cal. 3d 104, 108 & fn. 4; *People v. Dumas* (1973) 9 Cal. 3d 871, 882.) 'There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' (*People v. Ramey* (1976)[ ]16 Cal. 3d 263, 276.)" (*People v. Escudero* (1979) 23 Cal. 3d 800, 808-809.) "[A]lthough 'fresh pursuit' of a fleeing felon must be substantially continuous and afford the law enforcement authorities no reasonable opportunity to obtain a warrant, it is not necessary that the suspect be kept physically in view at all times." (*Escudero*, at p. 810.)

18   *Id.* The state appellate court questioned whether the fresh-pursuit-of-a-fleeing-felon exception

19   applied, stating:

20

21

22

23

It is questionable whether the "fresh pursuit" doctrine would apply in the present case, because "there was no immediate or continuous pursuit of the [suspect] from the scene of a crime." (*Welsh v. Wisconsin*, *supra*, 466 U.S. at p. 753.) There was an immediate, continuous and expeditious investigation that led the police to appellant's home within a short time, but the "pursuit" characterization is not accurate.

24   *Id.* at *5. However, the state appellate court found that the officers' warrantless entry into

25   Petitioner's home was justified based on Ms. Canevari's consent and the exigent circumstances

26   exception, and, thus, Petitioner had failed to demonstrate that he had a meritorious Fourth

27   Amendment claim. *Id.* at *5-8. In doing so, the state appellate court stated as follows:

28

Nevertheless, appellant has not demonstrated he had a meritorious

United States District Court
Northern District of California

Fourth Amendment claim. First, the warrantless entry may have been permissible due to the implied consent of appellant's girlfriend, Canevari. Consent is a recognized exception to the Fourth Amendment's warrant requirement, and that consent may be given by a third party "'who possesses common authority over the premises.'" (*People v. Superior Court (Walker)* (2006) 143 Cal. App. 4th 1183, 1198, *quoting Illinois v. Rodriguez* (1990) 497 U.S. 177, 181.) It may be inferred from the fact Canevari and appellant lived together that Canevari possessed authority to consent to the officers' entry into their joint home. (*People v. Frye, supra*, 18 Cal. 4th at p. 990.) Consent to enter may be express or implied. (*Ibid.*)

Respondent maintains that it is inferable from the transcript of the recorded encounter at appellant's home that Canevari permitted the officers to enter and led them to the bedroom where appellant was sleeping. The transcript reflects that when Canevari answered the door, Cook asked for appellant and she said he was sleeping. Cook asked where he was, Canevari said appellant's name, Cook asked Canevari to "step on out here," Canevari said appellant's name again, Cook and another officer repeated, "ma'am, come out here," Canevari said, "sorry," and Cook asked appellant to stand up. The recording of this exchange demonstrates that it happened quickly; less than 16 seconds passed from when Canevari answered the door to when Cook asked appellant to stand up. The volume of the voices on the tape indicate Canevari was close by the officers. These facts suggest that it was not far from the door of the house to where appellant was sleeping, and that Canevari accompanied the officers from one location to the other. There is no indication Canevari said anything to suggest she did not want the officers to enter the home. On the other hand, there is no way to tell from the transcript or the recording itself whether Canevari's nonverbal conduct expressed any desire to permit or prevent entry, and it is impossible to tell what was happening when the officers were asking her to "come out here."

If Canevari consented to the entry, of course, appellant's claim of ineffective assistance of counsel would fail because a suppression motion would not have succeeded. But even the ambiguity of the recording undermines appellant's claim: Had the suppression motion been made, the prosecution may well have been able to present other evidence demonstrating consent, such as testimony from one or more of the officers. In this context, it is appellant's burden to demonstrate the absence of consent.

Respondent also urges that the police entry into appellant's home was justified under the "exigent circumstances" exception to the warrant requirement. "'"[E]xigent circumstances" means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.'" (*People v. Williams* (1989) 48 Cal. 3d 1112, 1138, *quoting People v. Ramey*, *supra*, 16 Cal. 3d at p. 276.) The relevant inquiry is "whether, in light of all of the circumstances, there was an objectively urgent

11

United States District Court
Northern District of California

need to justify a warrantless entry." (*People v. Rogers* (2009) 46 Cal. 4th 1136, 1160-1161.)   "Generally, a court will find a warrantless entry justified if the facts available to the officer at the moment of the entry would cause a person of reasonable caution to believe that the action taken was appropriate." (*Id.* at p. 1157.)

Here, the trial court reasonably could have concluded that the circumstances justified the warrantless entry.   By proceeding to appellant's home as soon as he determined that appellant was the suspect in the assault and robbery, within two hours of the incident, Cook minimized appellant's opportunity to eliminate evidence of the offense.   In fact, appellant was found wearing clothes that fit the description given by Maggio and Lewis of what the assailant was wearing, adding further weight to appellant's identification as the perpetrator.   (See, *People v. Escudero*, *supra*, 23 Cal. 3d at pp. 810-811, fn. 6 [distinctive shirt worn by suspect not significantly less 'disposable' than narcotics or other contraband].)   Appellant argues that the fact Cook returned to the police station to prepare a photographic lineup demonstrates there would have been time to obtain a search warrant, but the lineup permitted Maggio to make the identification that gave Cook probable cause to arrest appellant. Prior to this photographic identification, Cook "thought" he knew the person Maggio was describing, but it was the photographic identification that confirmed Cook's suspicion.   It does not appear there was "unjustified delay" during which an arrest warrant could have been obtained.   (See, *People v. Williams*, *supra*, 48 Cal. 3d at p. 1139.)

*Id.* at *5-6 (footnote omitted).   The state appellate court further found that there was no prejudice, explaining:

In any event, it is unnecessary for us to determine whether appellant in fact would have prevailed if his attorney had pursued the motion to suppress on Fourth Amendment grounds, nor whether counsel's choice to drop the motion was reasonable, because there is no reasonable probability the result at trial would have been more favorable to appellant if his statements had been excluded.

With respect to the assault, the evidence against appellant—without consideration of his own statements to Cook—was overwhelming. Maggio, who had gone to school with appellant, identified him as the assailant; Flores saw appellant assaulting Maggio.   Appellant's argument at trial was that he assaulted Maggio but did not rob him. Thus, the only real question is the significance of appellant's statements to Cook on the issue of intent to rob.

Appellant argues that his statement was the crux of the prosecution's case, emphasized repeatedly in the prosecutor's closing argument as establishing appellant's intent to rob Maggio and also providing the basis for the prosecutor to argue that appellant's lies—telling Cook, for example, that he walked to Safeway alone rather than having driven with Flores, and saying he had not bought anything until Cook said the police had evidence he had done so—were evidence of his guilt.   The latter point is of little consequence in terms of prejudice, as the lies did not in any way bear on appellant's intent

12

and, as we have said, the evidence that appellant was the assailant was overwhelming. As to appellant's intent to rob Maggio, even without his own statements, the prosecution's case was very strong. Maggio, of course, described being robbed, and his story was corroborated by his torn pocket. Kirby heard Maggio yelling that he did not have any money, further corroborating that a robbery was in progress. And Flores's description of what appellant said when Flores asked him why he had assaulted Maggio was even more damning than appellant's own statement. Appellant's statement to Cook was that he was "a little upset" that he did not have any money on his card. Flores initially testified that when he asked why appellant had assaulted Maggio, appellant said he was "stressed out about needing money" and was "angry" and "took it out on the first person" he saw. Flores then acknowledged that he could have told the police appellant had said, "I'm mad, . . . I need someone's money."

Appellant argues that if his statement had been suppressed, he would not have had to take the stand to explain it. As appellant did not testify, this argument is difficult to comprehend.

Appellant also argues that if his statement had been suppressed he would have been free to attack Flores's credibility, suggesting that defense counsel did not vigorously challenge Flores's credibility because Flores's testimony was consistent with appellant's own statements. Further, appellant urges that in the absence of his statement, the defense could have highlighted Flores's motivation to testify against appellant in exchange for being given immunity from prosecution for his own role in the robbery. As it was, according to appellant, the jury heard only the prosecution's argument that while Flores's criminal history might undermine his credibility in general, his motivation as appellant's friend was to minimize appellant's conduct, so that anything he said against appellant should be considered trustworthy.

The prosecutor reminded the jury of the stipulation it had heard setting forth Flores's criminal history, and explained that this history provided "insight into the guy" to help the jury decide whether he was "completely believable." The prosecutor explained that juries are informed of a witnesses "moral turpitude crimes" because "the law says if you commit a moral turpitude crime conduct or conviction that means you might have a readiness to do evil," which "bears directly on this guy's credibility." The prosecutor stated that Flores's record would make it easy to decide not to believe anything he said, and asked the jurors not to do this, pointing out that Flores made clear his interest in not hurting appellant.

Perhaps defense counsel could have attempted to persuade the jury that Flores's record made him an entirely untrustworthy witness, motivated to testify against appellant. But Flores's testimony completely supported the prosecutor's characterization. Flores plainly did not want to testify against appellant. Although he related appellant's statement about needing money, he tried to minimize what the prosecutor wanted him to say—that appellant said he needed "someone's" money—acknowledging that "if that's in the [police] report . . . I guess that's probably what I said" but reiterating

13

that appellant was stressed and angry about needing money in general. Flores testified, "he was angry that night and it was bad time, you know. And shit happens, excuse my language." The prosecutor told Flores his demeanor suggested he was "having a little bit of trouble coming in and testifying about this" and asked if he did not want to testify, and Flores replied, "Well, I'm right here, you know, trying to keep it as honest as I can without him going, yeah." In the face of Flores's obvious discomfort, it would have been very difficult for the defense to have convinced the jury that Flores was manufacturing a statement to incriminate appellant. As it was, defense counsel tried to explain how Flores's testimony might be less damaging than it appeared: Counsel argued that it would have made no sense for appellant to have gotten into Flores's car saying "I need someone's money" and instead he might have said "I need some money." Defense counsel also told the jury, regarding Flores's prior convictions, that it could not assume appellant to be a "bad guy" because he "hangs out with the bad guy."

Given Flores's description of appellant's statement in the car, which was more damaging than appellant's own statement, and the other evidence described above, there is no reasonable probability appellant would have achieved a more favorable outcome at trial if his statement to the police had been excluded. His claim of ineffective assistance of counsel thus fails. (*People v. Mesa* (2006) 144 Cal. App. 4th 1000, 1008-1010.)

*Id.* at *6-8.

### 3. Applicable Law

An ineffective assistance of counsel claim under the Sixth Amendment is reviewed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the first prong, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Because of the difficulties inherent in fairly evaluating counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To satisfy the second prong under *Strickland*, a petitioner must establish that he was prejudiced by counsel's substandard performance. *See Gonzalez v. Knowles*, 515 F.3d 1006, 1014 (9th Cir. 2008) (citing *Strickland*, 466 U.S. at 694). Thus, to prevail on an ineffective assistance claim, the petitioner must demonstrate by a reasonable probability that but for the error of counsel, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694.

United States District Court
Northern District of California

1    Under AEDPA, a federal court is not to exercise its independent judgment in assessing

2    whether the state court decision applied the *Strickland* standard correctly; rather, the petitioner

3    must show that the state court applied *Strickland* to the facts of his case in an objectively

4    unreasonable manner.  *Bell v. Cone*, 535 U.S. 685, 699 (2002); *see also Cullen v. Pinholster*, 563

5    U.S. 170, 189-90 (2011) (federal habeas court's review of state court's decision on ineffective

6    assistance of counsel claim is "doubly deferential").  The Supreme Court has specifically warned

7    that: "Federal habeas courts must guard against the danger of equating unreasonableness under

8    *Strickland* with unreasonableness under 28 U.S.C. § 2254(d).  When section 2254(d) applies, the

9    question is not whether counsel's actions were reasonable.  The question is whether *there is any*

10   *reasonable argument* that counsel satisfied *Strickland*'s deferential standard."  *Harrington v.*

11   *Richter*, 562 U.S. 86, 105 (2011) (emphasis added).

12       "To show prejudice under *Strickland* resulting from the failure to file a motion, a

13   [petitioner] must show that (1) had his counsel filed the motion, it is reasonable that the trial court

14   would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that

15   there would have been an outcome more favorable to him."  *Wilson v. Henry*, 185 F.3d 986, 990

16   (9th Cir. 1999) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 373-374 (1986) (so stating with

17   respect to failure to file a motion to suppress on Fourth Amendment grounds)); *see also Van Tran*

18   *v. Lindsey*, 212 F.3d 1143, 1156-57 (9th Cir. 2000) (no prejudice suffered as a result of counsel's

19   failure to pursue a motion to suppress a lineup identification), *overruled on other grounds by*

20   *Lockyer v. Andrade*, 538 U.S. 63 (2003).

21       **4.  Analysis**

22       Where, as here, defense counsel's failure to litigate a Fourth Amendment claim

23   competently is the principal allegation of ineffectiveness, Petitioner must also prove: (1) "that his

24   Fourth Amendment claim is meritorious"; and (2) "that there is a reasonable probability that the

25   verdict would have been different absent the excludable evidence in order to demonstrate actual

26   prejudice."  *See Kimmelman*, 477 U.S. at 375; *see also Wilson*, 185 F.3d at 990.  Respondent

27   argues that Petitioner is not entitled to relief because the state appellate court properly found

28   defense counsel performed adequately as the Fourth Amendment claim lacked merit.  Dkt. 9 at 12.

15

United States District Court
Northern District of California

1    This Court agrees.  Specifically, the state appellate court found that a successful motion to

2    suppress based on the warrantless entry was foreclosed by: (1) Ms. Canevari's implied consent to

3    the officers' entry into her and appellant's home; and (2)  the exigent circumstances exception.

4    *Roston*, 2014 WL 4088196, *5-6.  Therefore, as explained below, the state appellate court

5    reasonably found Petitioner had failed to meet his burden to prove that he had a meritorious

6    Fourth Amendment claim.  *See Kimmelman*, 477 U.S. at 375.

7                        **a.   Implied Consent to Enter Home**

8         The Fourth Amendment generally prohibits the warrantless entry of a person's home,

9    whether to make an arrest or to search for specific objects.  *Payton v. New York*, 445 U.S. 573

10   (1980); *Johnson v. United States*, 333 U.S. 10 (1948).  The prohibition does not apply, however, to

11   situations in which voluntary consent has been obtained, either from the individual whose property

12   is searched, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), or from a third party who

13   possesses common authority over the premises, *see United States v. Matlock*, 415 U.S. 164, 171

14   (1974).

15        Consent to enter or search must be freely and voluntarily rendered and not a product of

16   police coercion.  *Schneckloth*, 412 U.S. at  227.  Whether a consent was voluntarily given depends

17   on the totality of the circumstances.  *Id.* at 227-28.  Relevant factors include the length and nature

18   of detention, the use of coercion or punishment by the police, and indications of "more subtle

19   forms of coercion that might flaw [an individual's] judgment."   *United States v. Watson*, 423 U.S.

20   411, 424 (1976).

21        The Supreme Court's cases "firmly establish that police officers may search [or enter]

22   jointly occupied premises if one of the occupants consents." *Fernandez v. California*, 134 S. Ct.

23   1126, 1129 (2014).  For example, a person with common authority over property can consent to a

24   search of that property, or in this case to entry into such property, without the permission of the

25   other persons with whom he shares that authority.  *Illinois v. Rodriguez*, 497 U.S. 177 (1990).

26        Here, it was inferable from the fact that Ms. Canevari and Petitioner resided in the home

27   that Ms. Canevari had the authority to consent to the police officers' entry.  *See Matlock*, 415 U.S.

28   at 171.  Furthermore, it is inferable from the transcript that Ms. Canevari gave the officers

16

permission to enter the home and led them to where Petitioner was apparently sleeping nearby. CT 127-128.  After she answered the door, at no time did Ms. Canevari tell officers that they could not come in.  CT 127.  Instead, she led them to Petitioner, who was sleeping.  CT 127.  Ms. Canevari seemed was more concerned about asking Petitioner "what happened," and did not seemed concerned about whether or not she had given consent to the officers who had already entered their home.  CT 127-128.  In light of Ms. Canevari's implied consent, this Court finds objectively reasonable the state appellate court's finding the officers' warrantless entry into Petitioner's home was justified.  This Court further finds objectively reasonable the state appellate court's conclusion that defense counsel did not perform deficiently by failing to challenge the admission of Petitioner's statement to police based on warrantless entry.

### b.  Exigent Circumstances Exception

"Where . . . the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed."  *Kentucky v. King*, 563 U.S. 462, 471-72 (2011).  There are exigent circumstances to justify a warrantless entry by police officers into a home if the officers have a reasonable belief that their entry is "'necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'"  *Huff v. City of Burbank*, 632 F.3d 539, 544 (9th Cir. 2011) (quoting *Fisher v. City of San Jose*, 558 F.3d 1069, 1075 (9th Cir. 2009)), *rev'd on other grounds*, *Ryburn v. Huff*, __ U.S. __, 132 S. Ct. 987 (2012).  Officers meet their heavy burden only by showing specific and articulable facts that justify a finding of exigent circumstances.   *Huff*, 632 F.3d at 545.

Here, when the officers arrived at Petitioner's home in the early morning hours of April 9, 2012 and knocked on his door, less than two hours had passed since the incident.  *Roston*, 2014 WL 4088196, *2-3, *6.  Even though Petitioner was not in the officers' constant sight during their pursuit of him, this factor did not undermine the exigency of the circumstances.  *See e.g.*, *People v. Escudero*, 23 Cal. 3d 800, 809 (1979) (finding exigent circumstances where the victim lost sight of the burglar, but promptly gave the police the burglar's description and registration information

which led the officers to the burglar's house within an hour).  The police officers had just gathered information from the victim, Mr. Maggio (including Mr. Maggio's positive identification of Petitioner in a photographic lineup), which pointed to Petitioner as the perpetrator.  *Roston*, 2014 WL 4088196, *3.  Officers then acted on that information as quickly as possible in pursuing Petitioner by going straight to his house.  *Id.* at *3.  By proceeding to Petitioner's house as soon as the officers determined that Petitioner was the suspect in the assault and robbery, the officers minimized Petitioner's opportunity to eliminate any evidence.  *See Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 623 (1989) (because the "delay necessary to procure a warrant . . . may result in the destruction of valuable evidence," the evidence should be sought and obtained as soon as possible); *see also People v. Seaton*, 26 Cal. 4th 598, 632 (2001) (the exigent circumstance to which a police officer responds may consist of the need to quickly prevent the evidence from being destroyed).  Indeed, when they found Petitioner, he was still wearing the clothes that fit the victim's and witness's descriptions of what the attacker had been wearing, bolstering the victim's identification of Petitioner.  *Roston*, 2014 WL 4088196, *3, *6.  Under these circumstances, this Court finds objectively reasonable the state appellate court's finding that the "exigent circumstances" exception to the warrant requirement justified the officers' warrantless entry into Petitioner's home.

In sum, defense counsel's failure to move to suppress his statement to the police—on the basis that it was obtained as a result of an unlawful warrantless entry into his home—did not fall below an objective standard of reasonableness and did not result in prejudice to Petitioner.  *See Strickland*, 466 U.S. at 687-88, 694.  Accordingly, the state appellate court's finding that Petitioner was not denied effective assistance of counsel for failure to file a motion to suppress was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on this claim.  *Id.*

### B.   Exclusion of Evidence of Mr. Maggio's Prior Claims of Victimization

Petitioner contends that the trial court abused its discretion in refusing to allow him to introduce evidence that Mr. Maggio had previously made false accusations of being victimized,

thereby violating Plaintiff's constitutional rights to cross-examine the witnesses against him and present a defense.  Dkt. 1 at 5.

### 1.  Background

The state appellate court gave the following background information relating to this claim:

> Appellant's defense, as we have said, was that he assaulted Maggio but did not rob him.  The only direct evidence of robbery came from Maggio.  Appellant wanted to demonstrate that Maggio had mental or emotional problems that led him to believe, incorrectly, that he was being victimized in the Safeway incident.

> At the time of trial, Maggio had a criminal case pending against him for violation of Penal Code section 653f, subdivision (a), on January 30, 2012, in which a question had been raised as to Maggio's competency to stand trial.  The prosecution filed a motion in limine seeking to preclude the defense from presenting evidence of this competency question, arguing that competency to stand trial and competency to act as a witness are not determined by the same standard.

> In response, appellant disavowed any intent to introduce evidence about the competency issue for the truth of the matter but sought to introduce evidence on a number of points in order to impeach Maggio's capacity to perceive and character for veracity.  The points appellant raised were that Maggio had made previous claims of being a victim of criminal conduct that were not credible; Maggio was addicted to pain medication; Maggio had been unable to relate truthful facts of previous emergency situations; and Maggio had refused to acknowledge the trial court's authority "to return to court and to contact medical personnel regarding possible competency issues."  The motion stated that Maggio had previously claimed he was "under assault" by his doctor because the doctor would not prescribe more pain medication; that Maggio was facing criminal charges for abusing the 911 emergency dispatch system by making numerous 911 calls even after being admonished to stop by the dispatcher and being threatened with arrest by police officers; that Maggio told police officers his doctor was assaulting him by not providing him with two tetanus shots and three Benadryl shots he claimed to need before 10:00 a.m. the next morning to avoid serious illness, and told police officers, "'I am being held hostage' by my doctor, you must arrest me now"; that Maggio then called 911 five times about "'a seven-year problem surrounding a loan'" which he felt was a crime and as to which no report was taken; and that Maggio had refused to comply with court orders (issued by the same judge as in the present case) to report for two psychiatric evaluations, and had an outstanding court order for an arrest warrant for intentional failure to appear in court on these matters.  In the present case, according to the motion, Maggio had continuously asked the investigating officer to sew his torn pocket; had testified at the preliminary hearing that he declined the option Officer Cook gave him of going to the hospital when in fact Cook had refused to take Maggio to the hospital because he had had multiple contacts

with Maggio at the hospital in which Maggio demanded pain medication that the staff refused, indicating Maggio might be an addict; and Maggio had testified at the preliminary hearing that appellant stole his driver's license, then admitted on cross examination that he had added this information to his claim when he met with the investigating officer just before the hearing, and that in fact appellant did not steal his license.

With respect to the pending case, the court noted that any questioning would raise the issue of Maggio's Fifth Amendment privilege against self-incrimination, requiring the court to consider whether the probative value of the evidence would outweigh the time consumed by dealing with "all the circumstances surrounding this and also dealing with Fifth Amendment privilege and also dealing with potential immunity proceedings." The court questioned the probative value of the evidence because the facts underlying the pending case occurred some four months before the present incident. The court did not view Maggio's statements to the 911 dispatcher and police as having much probative value absent proof that the statements were in fact false, and did not want to have a "mini-trial" concerning the pending case.

The trial court ruled that the defense could ask Maggio about his expectations in the pending case and whether any promises of leniency had been made to him, but not about the underlying facts. The court stated that defense counsel would be permitted "vigorous cross-examination to go into his emotional and mental stability" but not necessarily to address the pending case for that purpose. Regarding addiction to pain medication, the court noted that evidence of a witness's drug addiction is admissible only if it tends to show the witness was under the influence while testifying or when the events being related occurred, or that the witness's mental faculties were impaired by use of the drugs.

*Roston*, 2014 WL 4088196, *8-9.

## 2.   State Court Opinion

First, the state appellate court concluded that the trial court did abuse its discretion by

excluding the proposed evidence pursuant to California Evidence Code section 352, stating:

Evidence Code section 352 gives the trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'A trial court's exercise of discretion under section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner.' (*People v. Thomas* (2012) 53 Cal. 4th 771, 806.)" (*People v. Suff* (2014) 58 Cal. 4th 1013, 1066.)

Appellant views the evidence he sought to present as relevant and necessary to demonstrate that Maggio had a propensity to exaggerate claims of being criminally victimized, thereby

20

supporting appellant's defense that he assaulted but did not rob Maggio.  We disagree with appellant's view of the probative value of the proposed evidence and, therefore, find no basis to fault the trial court's exercise of discretion.

While evidence of a person's character or trait of character is generally inadmissible to prove his or her conduct on a specified occasion (Evid. Code, § 1101, subd. (a)), this rule does not make inadmissible "evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted . . . if the evidence is [¶] [o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character."  (Evid. Code, § 1103, subd. (a)(1).)  Pursuant to this rule, for example, in a rape prosecution, evidence that the victim has previously made false accusations of rape may be highly probative.  (*People v. Adams* (1988) 198 Cal. App. 3d 10, 16-17, 19; *People v. Burrell-Hart* (1987) 192 Cal. App. 3d 593, 597-600.)  Similarly, in a prosecution for sexual assault, *People v. Randle* (1982) 130 Cal. App. 3d 286, 295-296, found error in the exclusion of evidence that the victim had previously made false claims of being the victim of a purse snatch and of having been kidnapped at the same bar and restaurant where the charged offenses were alleged to have occurred.  On the other hand, where the evidence of past conduct has little probative value on the issue for which it is introduced, a trial court does not abuse its discretion in excluding evidence that would be admissible under this statute.  (*People v. Covino* (1980) 100 Cal. App. 3d 660, 666 [evidence that victim of sexual assault aggressively sought attention from men, hugged and kissed men in a public place, and encouraged men to take her home not probative on question whether sex with defendant was consensual].)

Maggio's complaints to 911 and police officers bear no similarity to the charged offenses in the present case.  Appellant characterizes the prior reports as false or exaggerated claims of being the victim of criminal offenses.  But it is obvious that those reports were not referring to anything like the assault and robbery here.  The claim of having been "assaulted" by his doctor's failure to provide the treatment Maggio believed he needed did not portray Maggio as the victim of a criminal offense; it expressed frustration and distress over a perceived lack of medical care.  Further, as the trial court discussed, the defense had no basis for anything other than speculation as to the truth or falsity of Maggio's belief that he needed the treatment in question.  To the extent the reports of a loan "problem" Maggio believed to be a crime could be seen as an actual report of a criminal offense, again, the defense had no information regarding the validity of the claim.  The evidence simply does not appear to cast light on the issue for which appellant sought to use it—Maggio's ability to perceive, during a physical assault, whether he was being robbed or merely assaulted.

Appellant takes issue with the trial court's emphasis on the past complaints having been made several months before the present incident, seeing this as too recent to support the trial court's view of them as "remote."  But the trial court's point was that Maggio's

United States District Court
Northern District of California

mental state was only relevant, for appellant's purposes, to the extent it had bearing on his ability to perceive and communicate at the time of the incident. Even if the past complaints reflected an impairment causing Maggio to misperceive himself as a victim, without a similarity in circumstances or explanation of what might cause the prior kind of misperception to operate in the present circumstances, the several month time difference served to further undermine the probative value of the evidence.

At the same time, the proposed evidence would have brought into the present case the as yet untried charges against Maggio for abuse of the 911 system, raising issues about Maggio's constitutional privilege against self incrimination, as well as the potential for undue consumption of time. Significantly, the trial court did not preclude appellant from cross-examining Maggio concerning his mental state and ability to perceive and relate the incident. On the contrary the court said it would permit "vigorous" cross-examination in this area. The court only precluded evidence concerning the pending case against Maggio.

*Roston*, 2014 WL 4088196, \*9-10.

Second, the state appellate court rejected Petitioner's claim that the trial court violated his constitutional rights to cross-examine and to present a defense. *Id.* at \*10. In doing so, the state appellate court explained as follows:

Appellant's contention that the trial court violated his constitutional rights to cross examine and to present a defense is unavailing. Portraying the court's ruling as precluding him from cross-examining Maggio, the sole witness to the disputed element of theft, on his ability to perceive and relate the events, appellant relies upon *Franklin v. Henry* (9th Cir. 1997) 122 F.3d 1270 to argue that evidence of Maggio's prior accusations "would have shown [the complaining witness] capable of fantasies about [others] analogous to the charges [he] made against [appellant]." (*Id.* at p. 1273.) As with the cases we have already discussed, the similarity between the prior accusations and charged conduct in *Franklin* is in no way matched in the present case. In *Franklin*, the defendant was accused of molesting the five-year-old daughter of a friend with whose family the defendant had lived for several months. Six months after the defendant left the household, the child reported that he had "licked her 'private' and made her lick his 'private.'" (*Id.* at p. 1271.) The trial court refused to permit the defendant to testify that in his presence, the child told her brothers that the previous night "her mother had come into her room and 'licked her private.'" (*Id.* at p. 1272.) The California Court of Appeal found the ruling error, but harmless, and the Supreme Court denied review. (*Ibid.*) The Ninth Circuit granted the defendant's petition for habeas corpus, finding the error was of constitutional magnitude and prejudicial. (*Id.* at p. 1273.) The *Franklin* court emphasized that the prosecutor's case was "not a strong one" and rested on whether the jury believed the child, and that, if believed, the defendant's testimony would have shown the child "capable of fantasies about her mother analogous to the charges she made against" the

1

2

3

defendant.  (*Id.* at p. 1273.)  Therefore, exclusion of the evidence "deprived [the defendant] 'of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful testing."'" (*Ibid.*, quoting *Crane v. Kentucky* (1986) 476 U.S. 683, 690–691.) For the reasons above, the present case does not rise to this level.[FN 5]

4

5

6

[FN 5:] Having reached this conclusion, we need not consider respondent's argument that appellant forfeited his constitutional claim by failing to raise it in the trial court, or appellant's argument that this failure by defense counsel constituted ineffective assistance of counsel.

7

*Id.* (footnote in original).*³*

8

### 3.  Applicable Law

9

#### a.  Right to Cross-Examine Witnesses Against Him

10

A defendant meets his burden of showing a Confrontation Clause violation by showing

11

that "[a] reasonable jury might have received a significantly different impression of [a witness']

12

credibility . . . had counsel been permitted to pursue his proposed line of cross-examination."

13

*Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986).  However, the Confrontation Clause does not

14

prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of

15

harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only

16

marginally relevant.  *Id.* at 679.  The Confrontation Clause guarantees an opportunity for effective

17

cross-examination, not cross-examination that is effective in whatever way, and to whatever

18

extent, the defense might wish.  *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam).

19

To determine whether a criminal defendant's Sixth Amendment right of confrontation has been

20

violated by the exclusion of evidence on cross-examination, a court inquires whether the evidence

21

was relevant, whether there were other legitimate interests outweighing the defendant's interests in

22

presenting the evidence, and whether the exclusion of evidence left the jury with sufficient

23

information to assess the credibility of the witness.  *United States v. Beardslee*, 197 F.3d 378, 383-

24

84 (9th Cir.), *amended*, 204 F.3d 983 (9th Cir. 2000).  *See generally Duhaime v. Ducharme*, 200

25

26

27

28

³ This Court notes that in 2002, the Ninth Circuit overruled *Franklin v. Henry*, albeit on other grounds than what this case was relied upon by Petitioner in state court.  *See Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002) (en banc), *vac'd on other grounds*, 538 U.S. 975 (2003), *on remand at Payton v. Woodford*, 346 F.3d 1204 (9th Cir. 2003) (en banc), *rev'd sub nom. Brown v. Payton*, 544 U.S. 133, (2005).  The *Payton* court overruled *Franklin* on the issue of the burden of proof under *Brecht*.  *See Payton*, 299 F.3d at 829 n.11.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  F.3d 597, 598 (9th Cir. 2000) (circuit-based law alone cannot form the basis for habeas relief

2  under the AEDPA, but circuit decisions are relevant as persuasive authority to determine whether

3  the state court's decision was an unreasonable application of Supreme Court precedent).

### b.  Right to Present a Defense

5  The United States Constitution gives a criminal defendant the right to present a defense.

6  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the

7  Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution

8  guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane*

9  *v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted).  The Compulsory Process Clause of the

10  Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process

11  for obtaining a favorable witness.  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  But the right is

12  only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . .

13  vital to the defense." *Id.* at 16.[4]  The Sixth Amendment right to present relevant testimony "may,

14  in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."

15  *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); *Taylor v. Illinois*, 484 U.S. 400, 410-11

16  (1988) (right to compulsory process is not absolute).  The Court has explained that a defendant

17  "'does not have an unfettered right to offer [evidence] that is incompetent, privileged or otherwise

18  inadmissible under standard rules of evidence.'" *Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996)

19  (plurality opinion) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)).   Even relevant evidence

20  may be excluded on account of certain evidentiary rules.  *See id.* at 42.  "[T]o say that the right to

21  introduce relevant evidence is not absolute is not to say that the Due Process Clause places *no*

22  limits upon restriction of that right"; rather, it means that the defendant has the heavy burden to

23  show that the decision to exclude evidence "'offends some principle of justice so rooted in the

24  traditions and conscience of our people as to be ranked as fundamental.'"  *Id.* at 43 (citation

---

26  [4] To determine whether the excluded evidence is relevant and material, and vital to the
27  defense, the court may consider the following factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it
28  constitutes a major part of the attempted defense.  *See United States v. Stever*, 603 F.3d 747, 755-56 (9th Cir. 2010) (quoting *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).

United States District Court
Northern District of California

1  omitted).  Even if the exclusion of evidence was a constitutional error, habeas relief is not

2  available unless the erroneous exclusion had a "'substantial and injurious effect or influence in

3  determining the jury's verdict.'"  *Brecht*, 507 U.S. at 638.

### 4.  Analysis

5  The state appellate court's rejection of Petitioner's claim was not contrary to, or an

6  unreasonable application of, these Supreme Court holdings.  Petitioner has not identified any

7  Supreme Court holding to the effect that the right to present a defense includes a right to present

8  irrelevant evidence, or that the right to cross-examine the witnesses against him includes a right to

9  cross-examine them about irrelevant evidence.  The requirement that evidence must be relevant to

10  be admissible is a core evidentiary rule, and is found in the Federal Rules of Evidence as well as

11  the California Evidence Code.  *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible");

12  Cal. Evid. Code § 350 ("No evidence is admissible except relevant evidence").  Petitioner also has

13  not identified any Supreme Court holding to the effect that an evidence rule that (like California

14  Evidence Code § 352) allows the exclusion of evidence—when its probative value is outweighed

15  by issue of undue time-consumption or confusion—violates the constitutional rights to present a

16  defense or due process.  Thus, Petitioner has failed to show that Section 352, the California rule at

17  issue, offends some "fundamental principle of justice" such that the rule itself violates a criminal

18  defendant's right to due process.  *See Montana v. Egelhoff*, 518 U.S. at 43.

19  It is debatable whether Supreme Court precedents on the right to present a defense could

20  support a finding of a violation of that right based on the application of an otherwise permissible

21  rule.  That is, the state court reasonably could determine that the right to present a defense is only

22  implicated if the rule itself is unconstitutional.  Even assuming arguendo that the right to present a

23  defense could be violated by the state court's application of a rule that did not itself violate a

24  constitutional right, Petitioner still would not be entitled to relief because the state court's

25  exclusion of the evidence under California Evidence Code § 352 was not an unreasonable

26  application of clearly established federal law.

27  Section 352, like its federal analog, Federal Rule of Evidence 403, is a rather

28  commonplace kind of evidentiary rule allowing the exclusion of evidence where its probative

25

1  value is substantially outweighed by the probability that its admission will necessitate undue

2  consumption of time, be unduly prejudicial, confuse the issues or mislead the jury.  As mentioned

3  above, Section 352 itself does not offend due process or the right to present a defense.  *Cf.*

4  *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("trial judges retain wide latitude insofar as

5  the Confrontation Clause is concerned to impose reasonable limits on such cross-examination

6  based on concerns about, among other things, harassment, prejudice, confusion of the issues, the

7  witness' safety, or interrogation that is repetitive or only marginally relevant").

8          The application of Section 352 in Petitioner's case to exclude evidence of Mr. Maggio's

9  prior claims of victimization did not result in a Confrontation Clause violation.  Nor did it violate

10  Petitioner's right to present a defense.  Specifically, the state appellate court reasonably

11  determined that Petitioner had not shown the relevance of the evidence.  The state appellate court

12  recognized that, consistent with Section 352 and the state evidentiary rules, the trial court properly

13  concluded that the evidence of Mr. Maggio's prior claims of victimization had little or no

14  probative value on the issue of whether he was credible and had a propensity to exaggerate claims

15  of being criminally victimized.  Mr. Maggio's prior complaints to the police and the 911

16  dispatcher were dissimilar to his complaints about Petitioner.  Mr. Maggio's prior complaints had

17  nothing to do with the crimes of robbery and assault.  Instead, one of Mr. Maggio's prior

18  complaints amounted to his frustration with his doctor for not prescribing him certain medications,

19  and another complaint was based on his belief that his loan problem constituted a crime against

20  him.  CT 97.  Thus, Mr. Maggio's prior complaints were irrelevant as to whether his claim of

21  Petitioner's assault and robbery of him was credible.  In addition, as the trial court stated, the

22  falsity of Mr. Maggio's beliefs that he needed the medication and that the loan problem

23  constituted a crime against him was based on speculation.  The defense had no information

24  regarding the validity of Mr. Maggio's claims.  Furthermore, a danger existed that if defense

25  counsel cross-examined Mr. Maggio about the statements and circumstances pertaining to the

26  charges against him, it would consume an undue amount of trial time, confuse the jury, and lead to

27  a mini trial in Petitioner's case regarding an irrelevant, collateral matter.  This Court finds that the

28  Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1    examination based on these concerns.  *See Van Arsdall*, 475 U.S. at 679.

2         Moreover, the exclusion of the aforementioned evidence left the jury with enough

3    information to assess properly the credibility of the witness.  Specifically, the trial court's ruling

4    excluding the instances pertaining to Mr. Maggio's own case did not result in a blanket exclusion

5    of evidence pertaining to Mr. Maggio's credibility, mental and emotional instability, or his ability

6    to perceive the incident involving Petitioner.  Thus, Petitioner had the opportunity to cross-

7    examine effectively Mr. Maggio and was not denied his right of confrontation by the trial court's

8    ruling.

9         Finally, the exclusion of the aforementioned evidence also did not deprive Petitioner of the

10   right to present a defense, i.e., from presenting the defense that he assaulted, but did not rob Mr.

11   Maggio and attempting to elicit such testimony during cross-examination of Mr. Maggio.  2RT

12   271-286, 294-303.  The right to present a defense "includes, 'at a minimum . . . the right to put

13   before a jury evidence that might influence the determination of guilt.'"  *Stever*, 603 F.3d at 755

14   (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)).  Here, Petitioner had the full

15   opportunity to present evidence that could influence the determination of his guilt.  The trial court

16   made it clear that defense counsel was entitled to "vigorously cross-examine" Mr. Maggio

17   regarding his ability to perceive the incident involving Petitioner (1RT 36-37, 2RT 267)**,** and

18   defense counsel did so (*see e.g.*, 2RT 272-286, 294-303).  During closing argument, defense

19   counsel highlighted weaknesses in the prosecution's case, including the possibility that Mr.

20   Maggio could have been "getting confused in his perception of the facts of what actually

21   occurred."  3RT 526; *see e.g.*, 3RT 525-532, 535-538.  Defense counsel also pointed out to the

22   jury that Petitioner had admitted to Officer Cook that he assaulted Mr. Maggio, but did not take

23   anything from him.  *See e.g.*, 3RT 537-541.

24        Accordingly, the state appellate court's rejection of this claim was not contrary to or an

25   unreasonable application of clearly established Federal law on the constitutional rights to cross-

26   examine the witnesses against him or to present a defense.  Therefore, this claim is DENIED.

27   **V.    CERTIFICATE OF APPEALABILITY**

28        No certificate of appealability is warranted in this case.  For the reasons set out above,

jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## VI.    CONCLUSION

For the reasons outlined above, the Court orders as follows:

1.     All claims from the petition are DENIED, and a certificate of appealability will not issue.  Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2.     The Clerk of the Court shall enter judgment, terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated:    March 28, 2016

YVONNE GONZALEZ ROGERS
United States District Judge